Good morning. Welcome to the Ninth Circuit. We have several cases submitted on the briefs this morning, so the first case for argument is Saevik v. Swedish Medical Center. Mr. Phillips, you may proceed. Thank you, Your Honors. May it please the Court. I will reserve three minutes for rebuttal time. I'll watch the clock. This appeal involves a straightforward application of well-established summary judgment principles. This case takes place in the context of whistleblowing, an attempted violation of Medicare fraud, and actual violations of the HIPAA statute, and other well-established public policy principles. The court below erred when it determined as a matter of law that Shannon's consistent and frequent updates to Sedgwick, the third-party agent in this matter, was that Shannon's notifications were insufficient to have given notice to Providence Health Systems, the largest to Swedish, of her need for medical accommodation consistent with what she's entitled to under federal law and state law. Because this error was at a minimum sufficient to overturn, to for a summary judgment, to survive summary judgment, this Court should reverse and remand the District Court. In addition to this error, I'll point to two other, which we believe are two other principal mistakes of law. The first is gaslighting Shannon into believing that she hadn't given notice, or given notice in the proper way, at the proper time, by proper means, and not being told by her HR, by her human resources person, Rob Honey, who verified on May 21st that Shannon had given notice and that her leave request was, in fact, on file with Sedgwick through December 31st of that year. The third error of law was the District Court's discrediting Shannon's witness-affiance, that is, career medical professionals, Annie Wong-Smith and Shimon Jefferson, and a Swedish-owned head of the department that Shannon received treatment in and worked for, Dr. Hart, who we deposed as a witness, who stated, based on his years in the field, that a person suffering acute necrotizing pancreatitis requires at least a year to recover. The ramp-up to recovery would be significant. Could I ask you to address the disparate treatment and retaliation claims for a moment? You have this email from Ms. Day, which seems like it might be good evidence of a discriminatory or retaliatory motive, but then we have this evidence that there was the time discrepancy and they say, well, we would have fired anybody who did that, and, indeed, we fired these two other people for doing it at the same time. So why isn't that a sufficient non-discriminatory, non-retaliatory reason to support the grant of summary judgment? May I ask, Your Honor, which email from Ms. Day are we referring to? Are you referring to the email where Ms. Day notifies the risk department of a potential Medicare risk in June when she knows Shannon's sick? Well, no. I was talking about the one that says she's been a problematic employee and there have been lots of investigations. But, I mean, set that aside. Your prime official case is whatever it is. The question is really about why isn't the evidence of a non-discriminatory or retaliatory reason sufficient for the grant of summary judgment? Thank you for the question, Your Honor. The Bechelder case points in the Ninth Circuit we consider requests for FEMA leave when those are considered a negative factor in an employment decision. And, by the way, no intent is necessary that this is illegal retaliation under construing the FMLA. Shannon's requests for time off, this is clearly pretextual. Our position is that these emails, that position is pretextual. Day clearly was looking for other ways to clean out the department that Madsen stated was under restructuring and the employees were grieving the restructuring of the department. That's aside. That was clearly expressly carved out from this case. I would point to the use of Shannon's request for time off in July, late July, to which she was entitled intermittent FEMA leave. The employer was given notice that she needed this time off at intermittent times. And the close in time to the termination and, by the way, the grievance meeting August 12th. And so, the termination of the grievance, including Shannon, who just requested time off and is intermittently reneeding time off, that's close in time under Bickhelder. This is a negative factor. And, by the way, not in addition to violations of the Federal Family and Medical Leave Act, which Congress found specifically is to balance the needs of the employer and the family, especially families. Congress found that to balance the needs of families, especially those headed by a single mother or a single parent, in this case, Shannon, a single mother with a sick child, especially is needing of a balance. And that's what the Federal Act was intended to provide. And use of that as a balance. Suppose that we, I was more focused. I mean, I take the point. I guess my question or this next question is about the state law claim. Suppose that we think that the evidence on summary judgment is such that there's no genuine dispute of fact that they would have fired her anyway, because, in fact, they fired these two other people. Does that mean that you lose or do you think that discrimination or retaliation could still be a motivating factor, even if for the termination, even if the termination would have happened anyway? Well, it's clearly a motivating factor. And frequently employers terminate employees on a mixed motivation of factors. Employers don't, this is, the case laws replete with these explanations that employers often act on mixed motives. All motives are not always articulated, right? There could be a legal and, and illegal motive. We're only, it's the illegal, the illegal reasons that are, that bring us here today. And the illegal reason is that Shannon, the fact is that Shannon, a single mother with a sick child, three children, attempting to balance her responsibilities as a, to her employer, which she takes very seriously, by the way, and is, has been repeatedly recognized as, as the top scheduler in the department. She, it was a banner year for kidney transplants, and Shannon's, the nurse whom Shannon supported, Shannon's team, in fact, repeatedly posted the most transplant recipients on the transplant list. So. There's so many issues in your appeal, and I want to get to a couple of the others. But before we leave this one, I think we're in this situation where the claim is disparate treatment. That's what we're talking about now. And in a disparate treatment claim, what is the disparate treatment shown to her, vis-a-vis other employees? Well, the other employees did not have a disability. In fact, the other employees donated some of their PTO time, and not only employees in Shannon's position, but nurses. You're talking about the other employees who were terminated. Oh, as Shannon stated in her, in her, one of her declarations, she believed that there were reasons for terminating the other employees. One employee was tardy frequently. I mean, that's not my client, and that's not actionable in this case. I wouldn't go there, because there are a number of things in her record that are not the most positive and glowing. On the other hand, she has a number of other things that you mentioned in terms of her care for patients, and how she performed her job, and that sort of thing. So I'm just trying to figure out what the disparate treatment is. Do you have evidence of other people with these kind of time card violations that were not fired? Well, this is, I don't have evidence of, the question is whether, whether, that's, you could answer my question. No, I don't have evidence. And that's, of course, what we're faced with now. We're at the summary judgment stage. It's not that there's going to be other evidence developed, presumably. So if we don't have other benchmark employees, and we have Savick plus these other two who were fired, I'm still having trouble untangling the legal basis of how we would reverse on the disparate treatment claim. Well, that's precisely what I referred to, what we referred to in our papers, as a Procrustean reason. This is convenient for the employer to wipe the slate clean for one issue, which was a restructuring of the department, and all of the, all of the attendees of the August 12th grievance meeting could be, could be taken care of, could be disposed of on a pretext. And that's precisely what, that's precisely what pretext is. There always is this question in pretext, as you know, where you get to, where the employer comes back and puts on the evidence as to why, and saying that anything to do with alleged disability is not a substantial motivating factor in our, you know, the challenge, both for you and for us, is figuring out, well, where in that calculus is there an issue of fact, or one that could be decided as a matter of law, given that we know what all the facts are. Thank you. Well, there is no, the balancing test, McDonnell Douglas is not employed for an FML claim, according to Backelder. And with respect to the, I think that the federal regulations inform us that notice is what's needed. And in this case, notice, Shannon gave notice. Shannon repeatedly gave notice. In fact, she, when she was, she, she gave notice when she was in the hospital. She gave notice time and time again. What we've discovered is that it seems the honest showing that, can you, can you just tell me what you think the strongest piece of evidence is that this was pretextual? Shannon requested time off the week, the last week in August to 2019. We see emails the week after, between day and, who, by the way, admitted that she never came across individuals needing disability discrimination, excuse me, needing disability, with a disability time off, collaborating with day to, to, to find circumstances to eliminate Shannon based on, based on taking time off for FMLA. This is, this is, so she was unnoticed that Shannon needed time off for FMLA. Oh, and a retroactive request, retroactive, in other words, acquiring, I see I'm eating into my, my rebuttal time, but retroactive notifications, justifications were permitted. With that, I'll look, I'm sure accommodate your time. I just have one question. We haven't really talked at all about this work from home situation where they had her working from home and then the claim is that she then didn't submit the appropriate documentation to continue that working from home. They told her, please come back, but if you aren't, you need to submit this documentation. So where did the disputed fact, which is material and genuine, Shannon, the time that the time, Shannon had, had several, several requests or leave, approved leaves on, with Sedgwick at any given time. One was from April 1st, from the prior to April 1st of the current year, of the year of interest, 2019, and when the operation, the procedure on 131 on January 31st, 2019. Do you have a clear and concise response as to the employer's claim that by June, she was supposed to come back or submit some either continuing or other requests? Yes, Judge McKeon. Where do we look for on that? She did so, and if you look, I can provide the that, that, that claim, which was, which was good until December 31st of 2019, was deleted, and it's a disputed fact, whether that was expressly deleted or inadvertent, and whether Shannon's attempts to, I'll say, resurrect that, to make that, to continue that claim in May, whether those were futile, because she contacted, Sedgwick attempted to extend this accommodation. Sedgwick told her, you don't need to, to file a new claim, Mrs. Savick. You're already being accommodated. You are working, you're working, presumably, through her skip-level supervisors grant of permission to, to tell, to telework, to work hybridly. Thank you. All right, thank you. We'll give you two minutes for rebuttal. Good morning, Your Honors. Morning. Katie Rosen, on behalf of the Swedish Medical Group and Rebecca Day. Your Honors, I think this is, is one of those disputed facts. They're actually not disputed facts. We, we accept the allegations that the plaintiff has made as true. Obviously, we have to, for purposes of summary judgment, and we did that in this case, and even if you do that, we still prevail on summary judgment, and I, I'm going to tell you why, and I'm going to go through each one of the claims, and I'm happy to entertain questions as I'm doing that. The first thing I want to discuss, because Your Honors brought that up, was the Washington Law Against Discrimination Retaliation claim. That has been a moving target, I feel, for the plaintiff. There's been a number of different allegations made as to the basis of that claim. I think, regardless of what you consider, we still prevail, and the reason for that is that we had legitimate business reasons for her termination. It's and then falsified time cards. Some of Day's comments, as alleged, are, are, are pretty bad, so why aren't those enough to create a genuine issue of fact as to whether discrimination was really her motivation for participating in this investigation versus just the, the time card issue? Are you referring to the comments, Your Honor, that Day made before she was the, the plaintiff's supervisor? Some of those, those comments, and then also the comment that she'd been habitually problematic and a drain on resources. Yeah, I mean, I think that, that the comments that were made before she became the plaintiff's supervisor were her just parroting back a comment that the plaintiff made to her, and, you know, were not, were not widespread comments that she was made, and were made a long time before she became her supervisor. And, and so those are isolated comments that, that, there's a lot of case law saying isolated comments don't form enough of a basis to show discrimination or. Let's wipe those off the board. Uh-huh. But, like, in a same time frame here, she was problematic and a drain on resources, Day says. Right. And it's kind of like, whew, she made some mistake and now we can get rid of her. I mean, isn't that a factual issue? Or whether, no, everyone who has a time card violation is fired. It isn't that a factual issue? Because you have all of her history, which is both positive and negative. It's so close in time and we look, you know, we're not a question of months or years. We're talking about, well, I think literally a month or so. So why isn't that enough to raise a question of fact? Because I don't think there's any discriminatory animus shown by saying she's a problematic employee. She was a problematic employee. But isn't there at least retaliatory animus shown by the next sentence, which is, there have been countless investigations either caused by and or resulted as an outcome from her grievances? I mean, like, you know, it's understandable why you would be annoyed with somebody who files lots of grievances, but that does, I mean, that's what retaliation is, right? I think the key factor to remember here is Day was not a decision maker in the decision to end plaintiff's employment. You know, that's Right, but surely they took into account, it wasn't as if Day's comments had no role whatsoever in this. Maybe she couldn't make the final decision, but certainly her participation in the investigation, these comments had to contribute to that decision, didn't they? No, because those people didn't even know that about any of these investigations or anything like that. They were looking, they were looking just at the timecard issue. And, you know, they fired Ms. Savick, as well as two other people. And so I think But didn't, I thought Day was the one who reviewed the camera footage and, like, collected some evidence, right? She did, yeah. And so if we think that she did, or if a jury could conclude that she did that because she was, you know, had this discriminatory or retaliatory animus and was, you know, looking for some way to get Ms. Savick, why wouldn't that be enough to show that it was a motivating factor? Because the evidence shows that she was looking at another employee, and that's when she discovered the Savick footage. So she wasn't setting out to look at Savick or to target Savick. She just stumbled upon the Savick timecard fraud. And so I think, and that's undisputed. So I think that really shows that there wasn't an effort to target Ms. Savick at all. And then when once the time, once she discovers the timecard fraud, it's out of her hands. I mean, that goes up to, you know, a more senior group of folks who then look at that issue. But isn't the notion here that that could have all been pretextual, that maybe she wouldn't have reported any of these folks for timecard fraud, except for out of an out of a motivation to retaliate against Savick? I mean, isn't that isn't that sort of the claim? Yeah, I think that's just, that is, that is, there's no evidence in the record to show that, though, that I mean, once there's timecard fraud discovered at Swedish, it has to be reported. Had Day previously reported other employees for timecard fraud? Is that in the record? It's not in the record. So, and I don't know the answer to it, Your Honor. But I mean, to your point about, you know, the, the email that Day sent and, and the termination decision, it just, it did not. I mean, and, and I think there's no evidence in the record to show that it did. That would be a, seems to me it could be a question for the jury to decide. I mean, I don't, I'm not sure that you've convinced me that it just could not. I mean, those, the comments are what they are. Right. But when you look at the circumstances surrounding the termination, I think if you look at that, if you look at those circumstances, you know, that's a compelling issue that two other folks were terminated at the same time. If it was really an effort to single her out, then why would they also terminate two other folks at the same time? You know, and, and it's consistent with, it's a violation of the policy. There's no dispute that she did it. And so, she, you know, and Day was not the decision maker in deciding to terminate. I mean, to your point, Day may have said, hey, here's some time card fraud evidence, but she's not the one that made the decision to terminate. And I think the case law is pretty clear that when she's not the one that made the decision to terminate, and the folks that did were removed from Ms. Savick and the day-to-day issues with her, there's no evidence they knew about any of the, you know, other problems or complaints Ms. Savick had caused. That, that you have to look at the termination in, in that way. I mean, to, to your point of whether… What is the, what is the testimony on that? On… On the other, the, the people who were the decision maker and the relationship to her? That they didn't really know her at all and didn't know, like, the circumstances surrounding her employment or anything like that. They were just looking at the time card fraud piece and deciding what they needed to do based on that issue. Can you tell us, what is your understanding of the causation standard under the WLAD? Because it's somewhat more permissive than the federal standard, right? And the Washington Supreme Court has said that, you know, the employer can show that the discrimination or retaliation was not a but-for cause of the termination, but, but the plaintiff might still have a claim, right? That a motivating factor is, is more permissive. So, what do you understand the standard to be and how would we apply that here? Sure, Your Honor. I mean, I think to, to your questions to Mr. Phillips and your point is, is, you're really asking, is there a mixed motive here? Because this, you're right, there can be more, more reasons for terminating somebody than just one thing and there can be a mixed motive. And, and, and the standard is, is it, you know, was it a but-for, did it contribute in a, in a but-for way to the termination? And I think what you have here… In a, in a, I'm sorry, in a, was it a motivating factor toward the termination? I'm sorry. So, was it a motivating factor toward the termination? And here, I just, I don't think there's any evidence that it was a motivating factor. The email exists, yes, but the weight of the evidence is that two other people were terminated at the same time. The folks that made the decision were not her direct supervisors. There's no evidence they knew about the email. And so, when you look at that, then, I mean, there's, there's no dispute to me that the termination had nothing to do with any other ulterior motive. I think the brief does not document all the statements that were made, the appellant's brief, so I'm having some trouble. So, I thought that, apart from Day's comment, that her retaliation was based on her grievance to the HR department, and that there was a pending grievance. Can you fill in the blanks there in terms of the timing of that? Of the… Because that's what I read her brief is saying was that, we're focusing on Day, but I thought that she, she was founding her retaliation based on her grievance to HR. There was a pending grievance that 17 employees signed, so, and she was one of the 17, but nothing else, nothing happened to the other 17. So, I think that takes the sails out of, you know, out of her retaliation claim because, you know, 17 people were party to the grievance, and they were not, none of those other people were disciplined other than the two time card, other ones that committed time card fraud. And how, what is the temporal relationship between that grievance and where it was in the process and then her termination? The grievance was pending at the time that she was terminated, and I think had been filed maybe two months before. Could you address the, there's a declaration from, this is a question about pretext, there's a declaration from Ms. Savick and from, I believe it was Ms. Smith, saying that the conduct that formed the basis for the finding of time card fraud was in fact common, that people would go to union caucuses. And the district court, I think, said that they didn't have foundation to say that, but why can't they testify about, you know, what a common practice is, and if their claim is this is a common practice for people to do, wouldn't that be evidence that would suggest that the firing was pretextual? I think what's important is that, that appellant's brief says that it's, that the CBA allowed for a 30-minute caucus, and that is nowhere in the CBA. Well, that's, I mean, I take the point, but it ultimately isn't the question, you know, not what does the CBA say, but what in fact happens, right? And if it is the case that this is something that people do and they don't get fired for it, that would suggest that the firing in this case was really for some other reason, wouldn't it? Yeah, I mean, there's no evidence other than Ms. Savick's testimony, and then a declaration from one of her, I think one of the other co-workers that was fired, that says that that was a practice. All the testimony from everyone at Swedish says that was not a practice, and that was never something that was allowed or was, you know, happened. I think it's so clear because it's not in the collective bargaining agreement. It's nowhere in any kind of policy or statement. Every person at Swedish said that's not, that isn't an issue, that's not a thing. And so I think in that, in that instance, it's, it's so clear that's not a practice, that it isn't a question of fact. And plaintiff has, I mean, submitted no, I mean, to say it's in the collective bargaining agreement when it's not, and when I specifically asked her in her deposition, where are you getting this from, this 30, you know, minutes that you get time? And she said it's in the collective bargaining agreement. And I said, okay, here's a copy of the collective bargaining agreement, show me where it says that. And she could not show me where it says that. What about the timing of this Sedgwick advice where her counsel has said that she had put in documentation, I believe it was in February, and that it was continuing. So by the time June came around, she was already covered by either additional documentation or having already been approved. Can you unpack that for us? Sure, Your Honor. He's conflating FMLA and accommodations. Okay. So the approval he's talking about is for intermittent FMLA leave, which she was approved for intermittent FMLA leave, and was able to take that. Nobody stopped her from taking that. There was no interference on that. What we're talking about is accommodation. Both accommodation and FMLA approval at Swedish are handled by Sedgwick. And the accommodation being the work-from-home accommodation? Correct. Yes, correct. And there's no dispute of fact there because, you know, she says in her email, I haven't filled out the paperwork. And then her testimony is that Sedgwick told her, well, as long as your supervisor says it's okay, you don't have to fill out the paperwork. Well, at one point, her supervisor said, you need to come back to the office. And so her supervisor was no longer saying it was okay, and she still refused to come back to the office and didn't come back for a month later, and never submitted that paperwork. So, I mean, he's conflating the FMLA and the accommodation piece. My time is up. I'm happy to answer any additional questions. Thank you, Your Honors. Mr. Phillips, you have two minutes. Thank you, Your Honors. There's no conflation between the FMLA leave and the reasonable accommodation request. There was an FMLA request which was granted from April 1, 2018 until April 1, 2019. And it's my belief, reviewing the record and the evidence, that defendants conflated the end of that one year, April 1st. It's at that point, 2019, that the employer started rattling Ms. Sedgwick to return to work, when, in fact, Ms. Sedgwick was sort of pulled in both directions because it was her understanding that she was being permitted to telework. We also can look at the evidence, and we can see that Ms. Sedgwick's request, because the issue that seemed to be coming at this point was this eruption of acute necrotizing pancreatitis that was unpredicted, that was a result of the January 31st procedure, which had her hospitalized half of February, and then she came back the end of February, and which Dr. Hart testified, and we all learned later in some medical research, takes a year to recover, to ramp up. That's what Shannon filed in February, and which we can also see in the record, and which HR confirmed in May, was still, and I think that's in the record I've shown the Court, but it was still valid through what was still on record through December 31st of that year. The second thing I want to bring to the Court's attention is we've also found in the record conflicting evidence of days, the day was a factor, did make a decision to terminate Shannon, and I could provide the Court with references to that. In conclusion, I'd like to point out that there are multiple disputes, generally disputes of reasonable fact, and for those reasons, we'd ask the Court to reverse and remand into the trial court for further proceedings. Thank you. Thank both counsel for the arguments in this case, and the case is submitted.
judges: McKEOWN, MILLER, THOMAS